**No. 24-1901**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

DEBRA PRATT,

      Plaintiff-Appellant,

   v.

WISCONSIN ALUMINUM FOUNDRY,

      Defendant-Appellee.

---

Appeal from the United States District Court
for the Eastern District of Wisconsin

Case No. 1:22-cv-00568-WCG

The Honorable William C. Griesbach,
Presiding

---

## BRIEF OF PLAINTIFF-APPELLANT, DEBRA PRATT

---

ALAN C. OLSON AND ASSOCIATES, S.C.
Nicholas O. Yurk
2880 S. Moorland Rd.
New Berlin, WI 53207
(262) 785-9606

Attorneys for Appellant Debra Pratt

October 11, 2024

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1901

Short Caption: Debra Pratt v. Wisconsin Aluminum Foundry

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  Debra Pratt

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Alan C. Olson and Associates, S.C.

(3)     If the party, amicus or intervenor is a corporation:

     i)       Identify all its parent corporations, if any; and

        n/a

     ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)     Provide information required by FRAP 26.1(b)    Organizational Victims in Criminal Cases:

   n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   n/a

---

Attorney's Signature: Electronically signed by Nicholas O. Yurk     Date: October 11, 2024

Attorney's Printed Name: Nicholas O. Yurk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 2880 S. Moorland Rd.

    New Berlin, WI 53151

Phone Number: (262) 785-9606        Fax Number: (262) 785-1324

E Mail Address: nyurk@employee-advocates.com

rev. 12/19 AK

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.......................................................................... 3

JURISDICTIONAL STATEMENT ............................................................ 5

STATEMENT OF THE ISSUES ................................................................ 5

STATEMENT OF THE CASE .................................................................... 7

SUMMARY OF ARGUMENT ................................................................. 17

ARGUMENT............................................................................................... 19

I.    The district court's order is reviewed de novo. ........................ 19

II.    The same evidence can support each of Pratt's claims. ....................... 20

III.    Pratt was retaliated against for Title VII-protected reporting............ 23

A.    Pratt's role was not relevant to her protected reports. ..................... 24

B.    Pratt reported acts prohibited by Title VII......................................... 26

C.    Pratt had direct evidence of retaliation. ............................................. 28

III.    Pratt was fired because of her sex. ......................................................... 29

A.    Pratt was meeting WAF's performance expectations. ..................... 31

B.    A report equally critical of Pratt and her male peers led to Pratt's termination and bonuses for her peers.......................................................... 33

IV.    Pratt was paid less than her most direct comparator. ......................... 35

CONCLUSION ......................................................................................... 37

CERTIFICATE OF COMPLIANCE ................................................... 38

CERTIFICATE OF SERVICE ............................................................... 38

REQUIRED SHORT APPENDIX ....................................................... 39

# TABLE OF AUTHORITIES

*Anders v. Waste Mgmt. of Wis., Inc.*,
468 F.3d 670 (7th Cir. 2006)........................................................................19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).....................................................................................19

*Boumehdi v. Plastag Holdings, LLC*,
489 F.3d 781 (7th Cir. 2007)...................................................................28, 29

*Coleman v. Donahoe*,
667 F.3d 835 (7th Cir. 2012)........................................................................34

*Collier v. Budd Co.*,
66 F.3d 886 (7th Cir. 1995)..........................................................................22

*Crawford v. Indiana Harbor Belt R.R.*,
461 F.3d 844 (7th Cir. 2006)........................................................................33

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*,
846 F.3d 216 (7th Cir. 2017)........................................................................36

*Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*,
988 F.3d 948 (7th Cir. 2021)........................................................................21

*Kralman v. Ill. Dep't of Veterans' Affs.*,
23 F.3d 150 (7th Cir. 1994)..........................................................................21

*Lewis v. Wilkie*,
909 F.3d 858 (7th Cir. 2018)........................................................................23

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015).....................................................................25-26

*Marshall v. Ind. Dep't of Corr.*,
973 F.3d 789 (7th Cir. 2020)........................................................................30

*McDonnell Douglas v. Green*,
411 U.S. 792 (1973)................................................................................30, 34

3

*Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,*
83 F.3d 833 (7th Cir. 1996) )................................................................21

*O'Neal v. City of New Albany,*
293 F.3d 998 (7th Cir. 2002)................................................................22

*Pantoja v. American NTN Bearing Mfg. Corp.,*
495 F.3d 840 (7th Cir. 2007)................................................................19

*Perdomo v. Browner,*
67 F.3d 140 (7th Cir. 1995)................................................................22

*Purtue v. Wis. Dep't of Corr.,*
963 F.3d 598 (7th Cir. 2020)..........................................................20, 30

*Vega v. Chicago Park Dist.,*
954 F.3d 996 (7th Cir. 2020)................................................................21

## Statutes

42 U.S.C. § 2000e................................................................20

## JURISDICTIONAL STATEMENT

This appeal is taken from the final decision of the U.S. District Court for the Eastern District of Wisconsin entered on April 22, 2024, by the Honorable William C. Griesbach, United States District Judge. The district court had jurisdiction over Plaintiff's Title VII (42 U.S.C. § 2000e) claims pursuant to 28 U.S.C. § 1331. The Notice of Appeal was timely filed with the District Court on May 21, 2024. The United States Court of Appeals has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.     Did Pratt present sufficient evidence to establish a factual dispute as to whether she was retaliated against for making reports of discrimination which were protected by Title VII?**

The district court held that Pratt could not show direct evidence of retaliation because she was a human resources employee, because the conduct she reported was not protected by Title VII, and because she failed to show a causal link between her protected activities and the retaliation.

The district court erred when focusing on a single protected report made by Pratt while completely ignoring that Pratt made numerous protected reports on behalf of herself and other employees.

**II.     Did Pratt present sufficient evidence to establish a factual dispute as to whether she was discriminated against on the basis of sex?**

The district court held Pratt failed to establish that she was meeting the legitimate performance expectations of the job and that she could not show other comparable male employees were treated differently.

This is plainly incorrect, as the record shows that one of the reasons Pratt was fired applied equally to numerous comparable male managers, all of whom received a bonus rather than being fired. Furthermore, whether the performance concerns raised by WAF were legitimate or pretext is plainly a disputed fact, making summary judgment inappropriate.

**III.     Did Pratt present sufficient evidence to establish a factual dispute as to whether she was paid less than her male peer?**

The district court held Pratt failed to show other comparable male employees were paid more because Pratt's job was not the same as her comparator's job. This ignores that Pratt was paid less during the period when she held the exact job which her comparator was hired to do, and ignores that Pratt's role and her comparator's role remained reasonably comparable even after they were split into two positions.

6

**STATEMENT OF THE CASE**

This case arises out of Plaintiff-Appellant Debra Pratt's employment with Defendant-Appellee Wisconsin Aluminum Foundry ("WAF"). Pratt began working at WAF in 2016 as a human resources and benefits administrator. (ECF No. 38 at ¶ 1). In that role, Pratt reported to Jim Behnke. (*Id.* at ¶ 2).

Jim Behnke worked for WAF for over thirty years. (ECF No. 33-2, 14:8). Behnke served as the human resources manager when Pratt was hired. (ECF No. 33-1, 20:7). In that role, Behnke neglected both his human resources and workplace safety job duties. (ECF No. 38 at ¶¶ 3, 6). Behnke did not investigate reports of discrimination or harassment in the workplace. (*Id.*) Behnke did not take reports of discrimination or harassment seriously. (ECF No. 37 at ¶ 6). Behnke's supervisor believed he was falsifying workplace safety data. (ECF No. 38 at ¶ 6). However, Behnke was ultimately fired for "conversations that took place in front of … his staff of a sexual nature that made the staff very uncomfortable." (*Id.* at ¶ 4-5).

After Behnke's firing in February of 2017, Pratt was promoted to human resources manager. (*Id.* at ¶ 7). During her first year as human resources manager, Pratt was praised for her performance and received a raise and bonus from her supervisor Ben Jacobs. (*Id.* at ¶¶ 10-11). Bonuses

7

at WAF were based on an employee's performance review. (ECF No. 33-2 at 63:10-64:6).

While Pratt's performance was praised, Pratt had serious concerns about WAF tolerating discrimination and harassment in the workplace and pushed to take these issues more seriously. (ECF No. 37 at ¶¶ 7-12). Pratt's efforts were brushed off by WAF management, who pushed back on the need for changes in the organization. (*Id.* at ¶ 13). Pratt believed that Jacobs would support her efforts to oppose discrimination at WAF, and so she began to make reports to Jacobs regarding discrimination and harassment she witnessed at WAF. (ECF No. 37 at ¶¶ 15-17).

Many of Pratt's reports involved Eugene Boyd, another one of Jacobs' direct reports.  (ECF No. 38 at ¶ 30). Over a two-year period, Pratt reported numerous concerns about how Boyd and his subordinates treated her and other women at WAF. (*Id.* at ¶ 25-26, 30-32). These reports were not part of Pratt's HR role as a neutral investigator of complaints—instead, Pratt brought complaints of discrimination and harassment for herself and others to upper management outside of her job duties. (*See, e.g., id.* at ¶ 30).

In relation to Boyd, Pratt first reported issues to Jacobs in April of 2017.  (*Id.* at ¶ 30). Pratt reported that Boyd told her that he singled out another female manager for harassment and intentionally left her out of

8

meetings, calling her a "bitch."  (ECF No. 38 at ¶ 30). Pratt stated that she felt Boyd had a problem with women in professional roles. (*Id*.) There was no complaint which prompted this report, as Boyd made the comment to Pratt herself. (*Id*.)

Next, Pratt reported to Jacobs that Boyd "flipped off" a female receptionist after she asked him to move his car from the visitor's parking lot. (*Id*. at ¶ 32). While these incidents may not rise to the level of conduct prohibited by Title VII, Pratt clearly reported that she felt Boyd exhibited a pattern of behavior which could be seen as discriminatory to women. (*Id*. at ¶¶ 30-33).

Pratt reported that Boyd treated the other employees in her department, who were all women, as his personal secretaries and had them do menial data entry tasks unrelated to their job duties. (*Id*. at ¶ 25). Pratt reported that Boyd would intentionally avoid working with HR on human resources functions, such as recruiting temporary staff directly rather than working with human resources to do so, and instead gave them menial work because they were women. (ECF No. 38 at ¶¶ 25-26). Pratt was clear in her reports that her concerns about Boyd were related to sex-based discrimination and harassment. (*Id*. at ¶ 26; ECF No. 37 at ¶¶ 64-71.)

One notable incident occurred during a January 2018 production meeting. Boyd's subordinate, Lili Goehring, said she fell down the stairs and bruised her "ass" or words to that effect. (ECF No. 33-1, p. 167). Boyd then asked Goehring to stand up on a table and show him. (*Id.*) The exchange made at least one employee who witnessed it uncomfortable, and they reported it to Pratt. (*Id.*)

Pratt learned of the incident while Jacobs was out of the office conducting union negotiations, and so she began drafting a document summarizing her conversations with witnesses to the incident. (*Id.*, p. 164). Pratt sent this document to Jacobs on February 19, 2018 to facilitate a discussion about what had happened. (*Id.*).

Pratt later learned that Jacobs received an earlier draft of her report from Tom Behnke on February 15, 2018, who received it from Rick Redeker on February 14, 2018. (*Id.*, p. 166). Pratt left the document in her desk, in her office. (ECF No. 37 at ¶¶ 37-39). Redeker alleged he found the document on the printer in the HR office. (*Id.* at ¶ 38). Redeker and Behnke both reported to Boyd, and all of Boyd's reports were managers similarly situated to Pratt. (ECF No. 33-2, 95:10-99:6).

Despite the document being found in the HR office and clearly reflecting an HR investigation, WAF hired a third-party investigator to

determine the author of the document on February 15, 2018, without informing Pratt. (ECF No. 33-1, p. 166). Pratt sent Jacobs a later version of the same document on February 19, 2018, without knowing about the investigation. (*Id.*, p. 164). When Pratt learned about the investigation and that it focused on her, not Boyd, Pratt told Jacobs she felt the investigation was retaliatory against her for raising concerns about Boyd, an allegation she repeated in writing on March 7, 2019. (*Id.*, p. 216).

Jacobs testified that Eugene Boyd and his direct reports Tom Culp, Rick Redeker, Tom Behnke told him they could not trust Pratt. (ECF No. 33-2, 54:1-2). This is unsurprising given the protected reports Pratt had made to Jacobs regarding their conduct.

Pratt reported numerous instances of Tom Culp discriminating against minority employees to Jacobs. (ECF No. 38 at ¶ 35-46). On or around October 27, 2017, Culp told an Asian employee he was denying him a promotion because he was Asian, though he claimed he was joking. (*Id.* at ¶ 37). A month later, Culp asked Pratt to write up a black employee for a demonstrably false reason. (*Id.* at ¶ 40). Pratt felt Culp's request was racially motivated, and reported this to Jacobs and Boyd, Culp's direct supervisor. (*Id.* at ¶¶ 41-42).

11

A few months later, Culp fired a Hispanic employee on his second day without going through any HR processes. (ECF No. 38 at ¶ 43). Pratt felt that Culp was treating minority employees different than white employees, as he did not have any similar issues where Culp fired or disciplined a white employee unfairly. (*Id.* at ¶ 46). Pratt reported the circumstances to Boyd and Jacobs, and specifically stated that she felt Culp was discriminating against racial minorities. (*Id.*). Pratt's report was ignored, and Culp received a bonus for his performance in 2018. (ECF No. 37 at ¶ 90).

Pratt also reported issues related to Tom Behnke. Specifically, on September 19, 2018, Behnke called Pratt a "cunt" and "bitch" because she asked him to sign a payroll change form. (*Id.* at ¶ 94). Pratt reported this to Jacobs. (*Id.*). Behnke received a bonus in 2018 for his performance, indicating a positive performance review. (*Id.*)

Pratt also reported to Jacobs on numerous occasions that Redeker was harassing an employee for requesting a workplace disability accommodation. (*Id.* at ¶¶ 91-92). Despite the fact that Jacobs knew Redeker was the individual who shared confidential documents with other employees and was credibly accused of stealing the documents from Pratt's desk, Redeker was never disciplined for any breach of confidentiality. (ECF

No. 37 at ¶¶ 37-39). Indeed, Redeker was paid a performance bonus in 2018, indicating a positive performance review. (ECF No. 37 at ¶ 93).

In late 2018, WAF hired a third-party entity, Utech, to interview employees and create a plan to address organization-wide concerns about company culture. (ECF No. 33-1, p. 193). The report generated by Utech was critical of many managerial employees, including Pratt, Jacobs, Boyd, and Boyd's reports. (*See generally, id.*, p. 195-205). The comments regarding Pratt were not more negative than the comments about other managerial employees. (*Id.*) Furthermore, the Utech comments allude to Pratt's protected reporting, stating that Pratt is seen as trying to make improvements within the HR department and the organization, but is perceived as investigating people instead of focusing on what's best for the company. (*Id.*, p. 205).

On December 7, 2018, Pratt received her 2018 performance review from Jacobs. (*Id.*, p. 208-09). In contrast to Redeker, Behnke, Culp, and Boyd, who received positive performance reviews and bonuses in 2018, Pratt's 2018 performance review rated Pratt extremely poorly, meaning she would not qualify for a bonus. (ECF No. 33-1, p. 208-09). On the performance review, Jacobs wrote that Pratt was "good on the benefits side" of her job but required more training on the HR side. (*Id.*). The performance review

stated that managers did not trust her, and that she was considered divisive by the Utech report. (ECF No. 33-1, p. 208-09).

At his deposition, Jacobs identified three reasons why he gave Pratt a negative review: the Utech report, a lack of trust in HR, and her alleged confidentiality issues. (ECF No. 33-2, 68:9-16). Furthermore, Jacobs clarified that the managers he was referencing were Boyd's direct reports—the same individuals who Pratt made protected reports regarding. (*Id.*, 54:1-5).

Boyd and managers who reported to Boyd told their employees not to trust HR and not to report concerns to HR because of Pratt's protected reporting. (ECF No. 37 at ¶ 56). Other managers made similar comments, including Rick Redeker, who explicitly told his direct reports to stop reporting workplace concerns to HR. (*Id.* at ¶ 58). Boyd and other managers made these comments because Pratt had reported their misconduct to Jacobs. (*Id.* at ¶ 57). Pratt reported this retaliation to Jacobs. (*Id.* at ¶ 59). In response, Jacobs told Pratt to "settle down." (*Id.* at ¶ 60).

Prior to March 7, 2019, most of Pratt's reporting had been made orally to Jacobs, but Pratt felt the need to put everything in writing to show she was serious about the concerns she had been reporting. *(See generally* ECF No. 33-1, p. 215-18). Pratt's March 7, 2019 email clearly and explicitly makes protected reports of discriminatory conduct. (*Id.*).

14

Pratt was fired on March 14, 2019. (ECF No. 37 at ¶ 57). Jacobs identified the main issue which led to Pratt's termination as healthcare onboarding, an issue which occurred in early 2018. (ECF No. 33-2, 135:2-136:7). This is directly contradicted by Jacobs' performance review of Pratt, which states that her work with employee benefits was Pratt's strength. (ECF No. 33-1, p. 208-09). Jacobs also cited the Utech report and an issue with a union as related to the decision to fire Pratt. (ECF No. 33-2, 135:2-136:7). The final reason was "trust issues." (*Id.*, 137:10-12).

This lack of trust is plainly related to Pratt's protected reporting. Jacobs knew the employees who did not trust Pratt were retaliating against Pratt for reporting their unlawful conduct. The reasons given by Jacobs in support of the termination were not supported by fact, were not recent issues, and were directly contradicted by earlier statements made by Jacobs. (ECF No. 37 at ¶ 57-63).

Given the timing of the firing, Jacobs' unwillingness to address her concerns about discrimination in the workplace, and the pretextual nature of the allegations against her, Pratt brought this suit alleging Title VII retaliation for her protected reporting, and sex-based discrimination in her firing and in her pay. (*See* ECF No. 1).

15

WAF filed a motion for summary judgement on December 22, 2023. (ECF No. 30). The district court granted that motion on April 22, 2024. (ECF No. 45). The district court dismissed Pratt's Title VII retaliation claim, finding that the incident with Boyd in February of 2018 was not sufficient to trigger Title VII protections—ignoring the legion of other examples of protected reporting—and that it was too far removed from Pratt's termination to support an inference of retaliation—ignoring the protected report made seven days before Pratt was fired. (*Id.*)

The court also dismissed Pratt's sex-based discrimination claims, finding that Pratt could not show she was treated differently than her peers as she was the only human resources manager in the organization, and that she was not meeting the legitimate performance expectations of WAF. (ECF No. 45).

Pratt filed a timely notice of appeal on May 21, 2024. (ECF No. 49).

16

## SUMMARY OF ARGUMENT

The district court erred when granting WAF's summary judgment motion. To reach that decision, the district court ignored facts which supported Pratt's claims, considered material disputed facts which do not permit summary judgment, and drew inferences in WAF's favor.

Pratt presented evidence that the reasons provided for her discharge were pretext—specifically showing internal documents which contradicted WAF's claims about its proffered reason for Pratt's discharge. Furthermore, the other factors WAF proffers as reasons for Pratt's discharge were either direct evidence of retaliation, or circumstantial evidence of sex-based discrimination. In light of these fundamental issues of motive and truthfulness, Pratt's claims must survive summary judgment.

Furthermore, in relation to Pratt's Title VII retaliation claim, the district court erred by focusing entirely on a single report of discriminatory conduct made by Pratt. Pratt made dozens of protected reports about discrimination in the workplace, including one that she made seven days before she was fired. Because none of the reasons WAF proffered for Pratt's termination had any basis in fact, and Pratt's termination immediately followed an escalation of her protected reporting, a reasonable fact-finder could infer retaliation.

17

In relation to Pratt's sex discrimination claim, the district court ignored the clearest evidence that Pratt was treated differently than her peers, a third-party report which was similarly critical of Pratt and her peers, but which resulted in her male peers receiving bonuses, while WAF claims it led to Pratt's termination. This sort of disparate treatment is prohibited sex-based discrimination.

Finally, in relation to Pratt's sex-based pay disparity claim, the district court ignored that Pratt was literally doing the job of her male comparator for three months, but was paid 76% of what her male comparator was paid. Doing the exact same work, plus additional work, and getting paid less for that work raises a significant inference of discrimination absent some compelling explanation. WAF provided no explanation, and so summary judgment was inappropriate.

## ARGUMENT

### I.     The district court's order is reviewed de novo.

An appellate court reviews a district court's grant of summary judgment de novo, viewing all facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See, e.g., Anders v. Waste Mgmt. of Wis., Inc.*, 468 F.3d 670, 675 (7th Cir. 2006).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Because evidence directly supporting a claim of intentional discrimination is rare, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840 (7th Cir. 2007).

The circuit court erred when it rejected Pratt's contentions on disputed facts and erred in failing to draw clear inferences of retaliation and discrimination from statements made by WAF, most notably from the vague allegations of "trust issues" put forward by the same managers who were the subjects of Pratt's protected reporting. The evidence at issue in this case would plainly allow a reasonable jury to find in Pratt's favor.

19

**II.    The same evidence can support each of Pratt's claims.**

Pratt alleged three causes of action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII further prohibits employers from "discriminat[ing] against any individual … because he has opposed any practice made an unlawful employment practice by this subchapter." U.S.C. § 2000e-3(a).

Pratt alleges WAF violated Title VII's prohibition on retaliation by firing her because of her opposition to unlawful discrimination. Pratt further alleges WAF violated Title VII by paying her less than her male peers and firing her because of her sex.

In Title VII cases, "[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable fact-finder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)(cleaned up). While the methods of analysis differ when examining direct or indirect evidence of

discrimination or retaliation, direct evidence and circumstantial evidence must be examined as a whole. *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021)("[A]ll evidence belongs in a single pile and must be evaluated as a whole."). At summary judgment, "[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [their] favor." *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020).

Pratt's retaliation claim is supported by the direct method of proof, while her sex-based discrimination claims are supported by circumstantial evidence. The elements of Pratt's prima facie case for these claims differ, but the analysis of pretext is the same for each of Pratt's claims.

"A pretext, in employment law, is a 'phony reason' that the employer offers for engaging in discriminatory conduct." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996). "A plaintiff can prove that an employer's proffered reasons for an employment decision are pretextual by one of two methods: (1) by showing that a discriminatory reason more likely than not motivated the employer . . . or (2) that the employer's proffered explanation is unworthy of credence." *Kralman v. Ill. Dep't of Veterans' Affs.*, 23 F.3d 150, 156-57 (7th Cir. 1994).

To survive summary judgment, an employee must produce evidence sufficient to allow a trier of fact to reasonably infer that the employer did

not believe its proffered reasons and discrimination was the real reason for the employee's discharge. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002). "If the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses . . . This credibility judgment is best left to the finder of fact." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). Indeed, when an employee puts forward "evidence that calls truthfulness into question," summary judgment is precluded "[b]ecause a fact-finder may infer intentional discrimination from an employer's untruthfulness." *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995).

In the present case, Pratt has plainly demonstrated that at least one of the purportedly legitimate reasons for her discharge—that she did a poor job addressing employee benefits issues—was false because WAF specifically noted that she did a good job in that area on her performance review. This is the exact sort of evidence which can raise an inference of unlawful discrimination or retaliation. Furthermore, Pratt has shown that the other issues which WAF proffered as reasons for her discharge were either directly related to unlawful retaliation, or were evidence of sex-based discrimination.

22

**III.    Pratt was retaliated against for Title VII-protected reporting.**

The primary basis for Pratt's lawsuit is WAF's retaliation against Pratt because of her Title VII-protected reporting. The record is replete with examples of Pratt opposing discrimination in the workplace, and then being directly or indirectly penalized for it. Pratt credibly testified she made these reports to Jacobs, who then ignored the reports and blamed Pratt for "trust issues" between Pratt and the individuals who were engaged in the unlawful conduct Pratt was reporting. Given that Jacobs was both receiving Pratt's specific reports of unlawful conduct and these vague allegations of mistrust, but could not identify any basis for this mistrust, it is clear that a reasonable fact-finder could find the "trust issues" to be Pratt's protected reports.

Pratt's retaliation claim is supported by direct evidence. To establish a prima facie case of Title VII retaliation, "[t]he direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

The district court held Pratt failed to establish the first and third element of this claim, but this holding relied entirely on Pratt's single report

23

regarding Boyd in February of 2018. When all of Pratt's protected reports are properly considered, the record is clear Pratt both engaged in protected activity and that protected activity directly led to Pratt's termination. The individuals who complained to Jacobs about Pratt were the individuals who were discriminating against their subordinates. Their complaints were made in retaliation for Pratt's reporting of their discriminatory misconduct, and so punishing Pratt for their criticism was retaliation prohibited by Title VII.

### A.     Pratt's role was not relevant to her protected reports.

The district court held that Pratt's reports were not protected in part because Pratt was WAF's human resources manager. This is a misapplication of a legal principle which is not supported by Seventh Circuit case law. While human resources employees are not necessarily opposing discrimination under Title VII when performing their job duties related to employee complaints of conduct prohibited by Title VII, they certainly do not forgo Title VII protection by virtue of their job title. Because Pratt's reports were made outside of her official job duties, and focused on opposing discrimination rather than protecting WAF, they are protected by Title VII.

24

The district court relied on *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015) to hold that Pratt was not engaged in protected conduct. In *Littlejohn*, the Second Circuit held that an employee who is "required as part of her job duties to report or investigate other employees' complaints of discrimination" cannot maintain a Title VII retaliation claim based solely on "reporting or investigating by itself … because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII." *Littlejohn*, 795 F.3d at 318.

However, the Second Circuit went on to explain that an employee with a role related to Title VII-protected reporting is still engaged in protected conduct if the employee "actively supports other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of her employer." *Littlejohn*, 795 F.3d at 318.

It is difficult to understand how this description would not plainly apply to Pratt. Pratt was not simply making reports as part of her job. In multiple instances, Pratt reported that she was the individual who had been harassed or discriminated against. (*See* ECF No. 38 at ¶¶ 50-51). In other cases, Pratt noticed a pattern of behavior which evidenced discrimination and reported it without a specific report to her. (*See id.* at ¶¶ 36-46). Pratt

25

was seen as an individual who was making these reports because she was opposed to discrimination in the workplace rather than making these reports to protect the company. (ECF No. 38 at ¶¶ 21, 24); *see also, Littlejohn*, 795 F.3d at 318 ("[C]ommunicating to the employer the manager's own belief that the employer has engaged in . . . a form of employment discrimination ... virtually always constitutes opposition notwithstanding the employee's underlying job responsibilities.").

In sum, Pratt made protected reports both inside and outside of her job duties, and clearly tied the conduct she was witnessing to violations of Title VII. This is plainly protected opposition to discriminatory conduct regardless of Pratt's role at WAF.

### B. Pratt reported acts prohibited by Title VII.

The district court focused on Pratt's report about Boyd's conduct in February of 2018 when holding that Pratt did not oppose discriminatory conduct prohibited by Title VII. While the district court is correct that this incident alone may not rise to the level of conduct prohibited by Title VII, Pratt clearly reported that Boyd exhibited a pattern of behavior which was discriminatory towards women and which would rise to a level prohibited by Title VII. (ECF No. 38 at ¶¶ 30-33).

As an initial matter, Pratt's reports related to Boyd were not limited to the February 2018 incident. Instead, she reported a pattern of behavior which began with Boyd calling Pratt's colleague, Jodi Rabitz, a "bitch," and telling Pratt that he intentionally antagonized Rabitz. (ECF No. 38 at ¶ 30). Pratt reported these facts to Jacobs and told him that she felt Boyd has a problem with women, especially those in professional roles. (*Id*.). The comments made by Boyd and his subordinates were not just isolated remarks, and Pratt reported that Boyd undercut and disrespected women in the workplace regularly. (*See* ECF No. 37 at ¶¶ 65-73).

Furthermore, Pratt made numerous protected reports about the conduct of Tom Culp. (ECF No. 38 at ¶¶ 36-46). Pratt reported that she believed Culp's conduct was discrimination based on race. (*Id*.) Indeed, there can be no dispute that Pratt's reports of Culp wrongfully disciplining two minority employees and firing a third employee because of their race would be protected by Title VII. (*See id*. at ¶¶ 41, 42, 46).

Finally, Pratt reported on March 7, 2019, that she believed she was being retaliated against for her protected reporting. (*See id*. at ¶ 56). Opposing retaliation for Title VII-protected conduct is itself protected reporting, and so Pratt's last protected report was made one week before she was fired. (*Id*. at ¶ 57).

### C.     Pratt had direct evidence of retaliation.

The district court held that Pratt failed to show evidence of a causal link between her protected reports and her firing because the district court only considered the report related to Boyd's conduct in February of 2018. This ignores that Pratt made numerous protected reports about Boyd's conduct after that meeting, and that Pratt made other protected reports about other employees and repeated many of those complaints in written form one week before she was fired. (*See* ECF No. 38 at ¶ 56).

The timing and lack of a non-pretextual explanation for the decision to fire Pratt strongly suggest Pratt was fired for her protected reporting. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007)("The causal link of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action."). It is uncontested that Pratt emailed Jacobs on March 7, 2019, and clearly and explicitly tied her reports to conduct protected by Title VII. (ECF No. 38 at ¶ 56). Pratt identified the investigation in February 2018 as the starting point of her protected activity but identified numerous issues that occurred between February 2018 and March 7, 2019 in her email. (*Id.*).

28

On March 14, 2019, a week after Pratt's explicit written report of retaliation for her protected reporting, Pratt was fired with no intervening event or any allegation of poor performance around that time. (ECF No. 38 at ¶ 57). This is the exact sort of suspicious timing which supports a retaliation claim. *See Boumehdi, LLC*, 489 F.3d at 793. WAF has produced no documentation to support that Pratt's termination was being considered prior to March 7, 2019 and there is clear reason to doubt WAF's proffered reasons for Pratt's termination were truthful. Accordingly, Pratt's evidence of suspicious timing can support a reasonable fact-finder believing that Pratt met her burden on this issue.

### III.    Pratt was fired because of her sex.

The district court held that Pratt could not show she was discriminated against because of her sex because she waived her claim by focusing on the evidence of retaliation, because she was not meeting WAF's legitimate performance expectations, and because she failed to show she was treated differently than similarly situated employees. This reasoning ignores that the main "legitimate performance expectation" raised by WAF was plainly and directly retaliatory—meaning it was necessarily not a legitimate performance expectation—and that the only remaining proffered

reason for the decision to fire Pratt involved clear disparate treatment on the basis of sex.

Pratt's sex discrimination claims can be proven using the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). "The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue*, 963 F.3d at 601–02. To make a prima facie case under *McDonell Douglas*, Pratt must show: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer. *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020).

Pratt's argument that her termination was sex-based discrimination is essentially an argument in the alternative to her retaliation claim—the evidence suggests that Pratt was fired because she opposed discrimination in the workplace, but if WAF is believed that the Utech report was a motivating factor in Pratt's firing, she was treated differently than her male peers. Every other manager criticized by the report was a man, and they

each received positive performance reviews in 2018. In contrast, Pratt, the sole woman discussed by the report, was fired for the same criticisms.

### A. Pratt was meeting WAF's performance expectations.

The district court's holding that Pratt waived her claim for sex-based discrimination belies the fact that the decision squarely, if incorrectly, addresses Pratt's argument on the issue. In her brief, Pratt plainly argued that she "was disciplined and fired for the same issues that her male peers had without consequence." (ECF No. 36, p. 4).

Pratt's position is clear. Pratt's manager contends that three main issues led to Pratt's termination: difficulties in early 2018 related to a change in benefits, confidentiality concerns related to her February 2018 report related to Boyd's misconduct, and the findings of the Utech report. (ECF No. 33-2, 68:9-16). The benefits issue is directly contradicted by WAF's own records, and the concerns about the report were pretext for retaliation rather than legitimate performance expectations. (*See* ECF No. 33-1, p. 208-09). However, if the Utech report is found to have motivated her discharge, WAF engaged in sex-based discrimination.

As discussed above, the record is clear that any issues with Pratt's confidentiality were pretext for retaliating against Pratt for raising concerns about Boyd rather than legitimate performance expectations. (*See* ECF No.

31

37, ¶¶ 37-39). There is simply no legitimate performance expectation which Pratt did not meet in this situation. (*See, e.g.,* ECF No. 37, ¶¶ 3, 28). Pratt authored a report in the ordinary course of her work, and left it in her desk, in a locked office. (ECF No. 37, ¶ 39). When the disputed facts are viewed in Pratt's favor, Pratt was punished for a coworker stealing sensitive HR material from her desk and then sharing it with others, while that coworker faced no consequences. (*Id.*, ¶ 93)

Second, there is simply no evidence in the record that Pratt's performance with regard to the benefit changeover was actually problematic, as the performance review which purportedly led to Pratt's termination specifically stated Pratt was "good on the benefits side" of her job. (ECF 38 at ¶¶ 60-61). Furthermore, the issues with the change-over in benefits occurred more than a year before Pratt's termination, and there is no documentation or any support for the contention that they were at all relevant to WAF's decision to fire Pratt. (*See* ECF No. 33-1, p. 208-09).

This leaves the remaining potentially legitimate basis for Pratt's termination as the Utech report. However, if the Utech report was the sole basis for Pratt's termination, Pratt's termination is plainly sex-based discrimination.

32

**B.      A report equally critical of Pratt and her male peers led to Pratt's termination and bonuses for her peers.**

The Utech report is key to Pratt's claim of sex-based discrimination. While it is critical of Pratt, it is similarly critical of Pratt's male peers in the organization. (*See* ECF No. 38 at ¶¶ 22-23). To the extent Pratt was fired because of the Utech report, Pratt was treated worse than her male peers in the organization, satisfying the last element of her prima facie case of sex-based discrimination.

The district court held that the Utech report could not support a finding of sex-based discrimination because none of the other managers identified in the report had a similar position to Pratt, and that the strengths and weaknesses identified for those male managers were not the exact same as those identified for Pratt. (ECF No. 45, p. 9-10). This myopic focus on the sameness of Pratt's comparators and their conduct ignores the bigger picture—that the reviews of Pratt's peers in the organization were uniformly similar in negativity and severity, and those peers—all male— received bonuses for their performance whereas Pratt was fired for it. (*See* ECF No. 38 at ¶¶ 22-23). This is sex-based discrimination, regardless of whether Pratt's comparators had the exact same job title or had the exact same flaws. *See, e.g., Crawford v. Indiana Harbor Belt R.R.*, 461 F.3d 844, 846 (7th Cir. 2006)(A "plaintiff should have to show only that the members of

33

the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment.").

The Seventh Circuit has specifically rejected a narrow understanding of the similarly situated analysis, holding that "similar enough to permit a reasonable inference of discrimination … is all *McDonnell Douglas* requires." *Coleman v. Donahoe*, 667 F.3d 835, 851-52 (7th Cir. 2012). For the purposes of establishing a comparator, factors such as whether the individuals "dealt with the same supervisor," "were subject to the same standards," "engaged in similar conduct" of comparable seriousness are relevant. *Coleman*, 667 F.3d at 847. "The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors." *See id.* at 846 (cleaned up).

"So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied." *Id.* (cleaned up). Further, "whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden." *Id.* at 846-47 (cleaned up).

The district court contends that Pratt failed to offer evidence that she was disciplined and fired for the same conduct as her male peers. This is

34

simply false, as the Utech report itself provides that evidence. (*See* ECF No. 38 at ¶¶ 22-23). Specifically, the other male managers who were identified in the Utech report are comparable to Pratt, as they were around her level in the organization, they operated in the same reporting structure, and each one was given a bonus in 2018 despite negative comments in the Utech report while Pratt was not. (ECF No. 38 at ¶ 12, 22-23; ECF No. 37 at ¶¶ 29-35). For example, both Boyd and Pratt reported to Jacobs, were evaluated on the same criteria by Jacobs, and were criticized in the Utech report. (*Id.*). Jacobs determined a bonus was appropriate for Boyd and decided Pratt should be fired. (ECF No. 38 at ¶¶ 33-34). This is the exact sort of disparate treatment which supports Pratt's claims.

## IV. Pratt was paid less than her most direct comparator.

Pratt's final claim which was dismissed by the district court was her Title VII pay discrimination claim. Pratt was paid $65,016 when she took over as human resources manager, a job which at that time included all of the job duties of the environmental health and safety manager. (ECF No. 37, ¶¶ 21-22; ECF No. 38, ¶ 8). In contrast, Pratt's male peer, Emery Coonen, was hired as the environmental health and safety manager three months after Pratt was promoted and was paid $85,328. (ECF No. 38, ¶¶ 14, 19). The district court held that because the job duties of the two positions were

35

sufficiently different, Pratt could not maintain a sex-based pay discrimination claim.

This holding completely ignored the fact that Pratt was literally doing Coonen's job for three months before he was hired. (ECF No. 37, ¶ 21). Pratt, when working as environmental health and safety manager and human resources manager, was paid 76% of what Coonen was paid while he worked as the environmental health and safety manager. (ECF No. 38, ¶¶ 8, 14).

A Title VII pay discrimination case requires showing that a plaintiff and a comparator were paid unequally for equal work. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 227 (7th Cir. 2017). However, absent some identifiable reason, there is no basis in law or common sense to find that a plaintiff who is doing two jobs should be paid any less than equally to someone doing one of those two jobs.

There is no such reason for the pay disparity in this case. The scope of the environmental health and safety manager role was not greater than the scope of the human resources manager role, Coonen and Pratt had significantly overlapping job duties, and Coonen was not more experienced, educated, or qualified than Pratt. (ECF No. 38, ¶¶ 17, 19).

36

While Pratt and Coonen's roles still overlapped after Coonen was hired, the fact that the pay disparity existed while Pratt was expected to do her job and Coonen's job plainly demonstrates a sex-based disparity in pay. WAF has put forward no legitimate reason for this disparity, and therefore, summary judgment is inappropriate.

## CONCLUSION

This Court should reverse the judgment of the district court and remand Pratt's claims for trial. Pratt's claims all have merit, and she should be permitted to have her day in court.

Dated October 11, 2024.

ALAN C. OLSON & ASSOCIATES, S.C.

*Electronically signed by Nicholas O. Yurk*
Nicholas O. Yurk, SBN 1095278
Attorneys for Plaintiff-Appellant
2880 S. Moorland Rd.
New Berlin, WI 53151

37

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief: (i) complies with the type-volume limitation of Rule 32(a)(7)(B) and Circuit Rule 32(c) because it contains 7,592 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and (ii) complies with the typeface requirements of Rule 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in 13-point Book Antiqua font.

*Electronically signed by Nicholas O. Yurk*
Nicholas O. Yurk

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of October, 2024, I filed the foregoing Brief and Required Short Appendix of Appellant with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*Electronically signed by Nicholas O. Yurk*
Nicholas O. Yurk

38

## REQUIRED SHORT APPENDIX
*Pursuant to Circuit Rule 30(a)*

## TABLE OF CONTENTS FOR APPENDIX

Judgment Under Review ...................................................................... A-1

Opinion and Order ............................................................................ A-2

## CERTIFICATION

Pursuant to Circuit Rule 30(d), I hereby certify that this Appendix includes all the materials required by Circuit Rule 30(a) and (b).

*Electronically signed by Nicholas O. Yurk*
Nicholas O. Yurk

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

EASTERN DISTRICT OF WISCONSIN

DEBRA PRATT,

        Plaintiff(s),

      v.

WISCONSIN ALUMINUM FOUNDRY,

        Defendant(s).

**JUDGMENT IN A CIVIL CASE**
Case No. 22-C-568

☐   **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict

☒   **Decision by Court.**  This action came before the Court for consideration.

    **IT IS HEREBY ORDERED AND ADJUDGED** that plaintiff takes nothing, and this case is DISMISSED.

Approved:  s/ William C. Griesbach
        WILLIAM C. GRIESBACH
        United States District Judge

Dated:  April 22, 2024

        GINA M. COLLETTI
        Clerk of Court

        s/ Lori Hanson
        (By) Deputy Clerk

A-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEBRA PRATT,

      Plaintiff,

      v.                         Case No. 22-C-568

WISCONSIN ALUMINIUM FOUNDRY,

      Defendant.

---

**DECISION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Debra Pratt filed this employment discrimination action against her former employer, Defendant Wisconsin Aluminum Foundry (WAF). The complaint asserts three separate Title VII claims: discriminatory discharge, pay discrimination, and retaliation. The court has jurisdiction pursuant to 28 U.S.C. § 1331. Before the court is WAF's motion for summary judgment. For the following reasons, the motion will be granted, and the case will be dismissed.

## BACKGROUND

Ms. Pratt was hired by WAF as an HR/benefits administrator in August 2016, with an annual salary of $55,000. She initially reported to HR Manager Jim Behnke. Ms. Pratt's duties included validating invoices for benefits, entering information for dental plans, and running reports for pensions. Mr. Behnke left WAF in February 2017 and Ms. Pratt was promoted to fill the HR Manager position. As HR Manager, she reported to Ben Jacobs, WAF's Senior Vice President and Chief Product Officer. Mr. Jacobs set Ms. Pratt's annual salary, which was increased to $65,016 when she became HR Manager. Mr. Jacobs made the decisions to increase Ms. Pratt's salary on January 1, 2018, and to award her a performance bonus for 2017. Ms. Pratt's annual

A-2

salary increased to $69,567.12 effective January 1, 2018.  She also received a bonus of $9,000 for her 2017 performance.

Throughout 2018, however, several incidents occurred that called into question Ms. Pratt's performance.  In January 2018, Controller Jody Rabitz and payroll clerk Lisa Novachek pointed out numerous errors regarding plan numbers for employees in a master spreadsheet of benefits deduction information.  HR was responsible for preparing the spreadsheet and ensuring that it matched the enrollment sheets before the payroll department would enter deductions.  Pratt Dep. 63:16–65:25, Dkt. No. 33-1.  Ms. Rabitz explained that "we cannot afford for the information to not line up because screens aren't coordinating correctly," and Ms. Pratt agreed that HR needed to avoid those errors.  Def.'s Proposed Findings of Fact (DPFOF) ¶ 51, Dkt. No. 32; Pratt Dep. 65:12–25.  Ms. Pratt personally admitted responsibility for it, stating "I must have deleted a row but only a partial row causing everything to be off."  Pratt Dep. 64:12–15.

That same month, Ms. Rabitz sent another email to Ms. Pratt questioning a number of details in the master spreadsheet and describing the process as very confusing, to which Ms. Pratt responded by acknowledging making several mistakes during the process.  DPFOF ¶¶ 52–53.  Ms. Rabitz described the process for Health Savings Account (HSA) contributions in January 2018 as being disorganized and not working for the Payroll Department.  *Id.* ¶ 54.  Ms. Rabitz questioned why the HR employees did not work on a Saturday to ensure data was accurate given its critical nature.  *Id.* ¶ 55.  In April 2018, Ms. Novachek questioned Ms. Pratt as to why she had not caught a January rate change for insurance premiums, which another employee caught, and the error would be ongoing if that employee had not caught it.  *Id.* ¶ 56.

In February 2018, Maintenance Manager Rick Redeker presented Mr. Jacobs with a four-page document Mr. Redeker had found on the copy machine in the HR work area.  *Id.* ¶ 33.  This

2

document contained notes of an apparent investigation into various allegations of verbal abuse of some employees by others in December 2017 and February 2018. Dkt. No. 33-1 at 183–86. There was also discussion of drug screens and drug use, complaints about special treatment for some employees, and what were called "sexual innuendos" between Eugene Boyd, Vice President of Operations, and Material Manager Lili Goehring. According to an unidentified witness designated "Witness 1," Ms. Goehring had come into a morning meeting a couple of weeks earlier and said she fell and bruised her "butt." Witness 1 stated that Mr. Boyd told her to get up on the table and show everyone. Sometime previously, according to Witness 1, Mr. Boyd was alleged to have put his thumb on the table, stuck it up, and told Ms. Goehring to "sit on it and he would spin her." *Id.* at 185. Other witnesses who were at the meeting did not corroborate Witness 1's account of the two incidents but one, designated "Witness 2," stated "there was [sic] some people complaining about the behavior between Lilly [Goehring] and Eugene [Boyd] but it does not seem to bother Lilly." *Id.*

WAF hired a third-party investigator, Amy D. Hartwig of GO Management Solutions, to determine the author of the document, how Mr. Redeker obtained the document, and the veracity of the allegations contained in the document. DPFOF ¶ 35. Unaware that a third-party investigation was happening, Ms. Pratt sent Mr. Jacobs a report that appeared to be a revised version of the same document Mr. Redeker had found. *Id.* ¶¶ 36, 39. In the revised report Ms. Pratt sent to Mr. Jacobs, the account provided by Witness 2 corroborated Witness 1's statement that Mr. Boyd invited Ms. Goehring to "get up on the table and show everyone." Dkt. No. 33-1 at 187. Ms. Pratt also included in her revised report the following "finding" about the interaction between Mr. Boyd and Ms. Goehring:

> Lastly, the biggest concern of all is that of sexual harassment. While at this point in time, it appears to be of a joking nature between participants. However, this is still

3

unprofessional and against the law. It is also important to recognize that any witnesses to this have the ability to file a sexual harassment complaint with the company as well as the EEOC and with the statements that were received this would be a difficult case to defend.

*Id.* at 188.

In fact, it appears that Ms. Goehring and Mr. Boyd were joking about Ms. Goehring's statement that she had slipped and "bruised her ass." Neither had made any complaint about the other and Ms. Pratt only learned of the incident when she was investigating an allegation by another employee that he had been told by four people that a different co-employee had called him "every name in the book." Dkt. No. 33-1 at 187. Ms. Pratt had made her "finding" without interviewing either Mr. Boyd or Ms. Goehring.

After interviewing Mr. Boyd, Ms. Goehring, and the other witnesses to the incident, Ms. Hartwig concluded that Ms. Pratt was the author of the document that Mr. Redeker had found, that several people who should not have seen the confidential information in the document saw it because it was left unattended and was not properly safeguarded, and that Ms. Pratt's handling of the document showed a lack of experience and sound judgment because she prematurely and inappropriately made factual and legal conclusions without conducting a full and fair investigation into the facts. DPFOF ¶¶ 43–44. Ms. Pratt denied that she had left the document in the printer and thought Mr. Redeker had taken it from her desk. She nevertheless acknowledged that it was problematic to leave the document on the printer and understood why WAF would be concerned that Mr. Redeker obtained a copy of the document. *Id.* ¶¶ 42, 45–46. As a result of Ms. Hartwig's investigation, Ms. Pratt was given training on how to conduct and document investigations, and Mr. Boyd and Ms. Goehring received training to address their conduct. *Id.* ¶¶ 47–48.

In July 2018, WAF retained a consulting group, Utech, to assist in creating a strong and stable future for the organization. *Id.* ¶ 70. As part of its consulting project, Utech interviewed 51

WAF leaders and employees, including Pratt. *Id.* ¶ 71. Utech provided the WAF Board of Directors a document titled "Feedback Themes and Trends," reflecting general themes that were articulated by more than five individuals during interviews, not attributed to any specific individual. *Id.* ¶¶ 72–73. The Utech report, which is dated September 27, 2018, offered strengths and concerns for each of the managers. *Id.* ¶¶ 76–77. With respect to Ms. Pratt, the report stated, "[s]he has not built trust with many in the organization. Many see Deb as having her own agenda, focusing on investigating people and making issues more dramatic than necessary. She is also feeding into the culture of gossip instead of being the one to stop it." Dkt. No. 33-1 at 205.

Ms. Pratt received an overall performance rating of 10 out of 32 in her 2018 Employee Performance Appraisal, which was prepared by Mr. Jacobs and delivered to Ms. Pratt on December 7, 2018. DPFOF ¶¶ 78–79. Ms. Pratt's overall performance led Mr. Jacobs to give her a zero rating for conducting herself with honesty, integrity, and a high level of business ethics, believing that, under Ms. Pratt's management, HR was not a safe confidential place for the organization like it was supposed to be. *Id.* ¶ 80; Jacobs Dep. 60:4-20, Dkt. No. 33-2. When she received the 2018 performance appraisal, Ms. Pratt told Mr. Jacobs that she felt like she had been retaliated against since bringing forward concerns of sexual harassment by Mr. Boyd in February 2018. DPFOF ¶ 83. In a February 22, 2019 email to Board Member Laurie Herzog, Ms. Pratt wrote that she felt she was targeted after February 2018. *Id.* ¶ 84. On March 7, 2019, Ms. Pratt sent an email to Mr. Jacobs questioning various portions of the 2018 Employee Appraisal and stating in reference to the February 2018 investigation into Mr. Boyd: "[I]t is my perception that you do not like me and feel this is directly related to the events in February and due to my inability to turn a blind eye to those events . . . . I was participating in a protected activity in February 2018, and I feel I have suffered retaliation on a repeated basis as a result." *Id.* ¶ 86.

Mr. Jacobs and Board Member Lutsky met with Ms. Pratt on March 15, 2019, to terminate her employment. *Id.* ¶ 95. Mr. Jacobs testified that he and Ms. Lutsky determined they needed to make a change in the HR leadership because of Ms. Pratt's ongoing performance deficiencies, including, for example, difficulties in her day-to-day job responsibilities, other employees' lack of trust in her, the results of the investigation circumstances surrounding her leaving a confidential report in the office copying machine, the results of the Utech Report, and the challenges caused by her failure to follow the proper process for hiring for a union position. *Id.* ¶ 96. Michelle Szymik was hired to replace Ms. Pratt. *Id.* ¶ 97.

## LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 975 (7th Cir. 2000). A fact is material only if it might affect the outcome of the case under governing law. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993). In deciding a motion for summary judgment, the court must view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that

6

party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

**A.  Title VII Termination Claim**

Ms. Pratt claims that she was terminated from her position as HR Manager at WAF because of her sex.  It is, of course, her burden to show that sex was the motivating factor in WAF's decision to terminate her employment.  In Title VII discrimination claims, "the test 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).  "*Ortiz*, however, did not alter '[t]he burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).'" *Id.* (quoting *Ortiz*, 834 F.3d at 766).  The court will employ that framework because the parties rely on *McDonnell Douglas* as "a means of organizing, presenting, and assessing" evidence.  *Id.*  "[U]nder *McDonnell Douglas*, the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Id.* at 225 (internal quotation marks and citation omitted).  If the plaintiff can establish a *prima facie* case, the burden then shifts to the employer to articulate "a legitimate, nondiscriminatory reason for the adverse employment action," after which a plaintiff only prevails if she shows that the explanation is pretextual.  *Id.*

7

At the outset, the court finds that Ms. Pratt waived her discriminatory discharge claim because her arguments focus solely on the alleged retaliation. "Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). The meat of Ms. Pratt's argument is that she was terminated because she investigated a complaint that Mr. Boyd had engaged in sexually harassing conduct. She states that "there is reason to doubt any issue other than Ms. Pratt's investigation into Eugene Boyd was responsible for her negative performance review." Dkt. No. 36 at 5. According to Ms. Pratt, her poor performance review was due to her investigation of Mr. Boyd, and when she "complained that her negative review was given to her in retaliation for her Title VII protected reporting, [she] was fired a week later." *Id.* at 7. This amounts to an argument in support of her retaliation claim, not in support of discriminatory termination on the basis of sex.

In addition to waiver, Ms. Pratt's discriminatory discharge claim fails because the undisputed evidence establishes that she was not meeting WAF's legitimate performance expectations. As noted above, Controller Jody Rabitz and payroll clerk Lisa Novachek pointed out numerous errors regarding plan numbers for employees in a master spreadsheet of benefits deduction information in January 2018. DPFOF ¶ 51. That same month, Ms. Rabitz sent another email to Ms. Pratt questioning a number of details in the master spreadsheet and describing the process as very confusing, to which Ms. Pratt responded by acknowledging making several mistakes during the process. *Id.* ¶¶ 52–53. Ms. Rabitz described the process for Health Savings Account (HSA) contributions in January 2018 as being disorganized and not working for the Payroll Department. *Id.* ¶ 54. In April 2018, Ms. Novachek questioned Ms. Pratt as to why she

8

had not caught a January rate change for insurance premiums, which another employee caught, and the error would be ongoing if that employee had not caught it. *Id.* ¶ 56.

Ms. Hartwig's third-party investigation into the circumstances surrounding the confidential investigative report left in the copying machine and the Utech Report to management provides further support for WAF's determination that Ms. Pratt was not meeting the expectations of her employment. Ms. Pratt had concluded from her investigation of an entirely unrelated complaint that Mr. Boyd had sexually harassed Ms. Goehring without even interviewing either of them, and then left her confidential report containing that "finding" in a copy machine to which other employees had access. Dkt. No. 33-1 at 167, 188. Based on her independent investigation, Ms. Hartwig concluded that, not only had Ms. Pratt's drafting and handling of her report shown a lack of experience and sound judgment, but she had "prematurely and inappropriately made factual and legal conclusions without conducting a full and fair investigation into the actual facts." *Id.* at 167.

The Utech Report likewise provides support for WAF's contention that Ms. Pratt was not meeting performance expectations. Ms. Pratt does not deny that Utech concluded from its interviews with her co-employees that she had not built trust with many in the organization, that she was seen as having her own agenda, focusing on investigating people and making issues more dramatic than necessary, and that she was feeding into the culture of gossip instead of being the one to stop it. Instead, she argues that other managers also were criticized, yet none were terminated and instead they received bonuses. DPFOF ¶ 77. She contends, instead, that she "was disciplined and fired for the same issues that her male peers had without consequence." Dkt. No. 36 at 4.

Unfortunately, she does not offer any specific evidence supporting her assertion. An assertion, unsupported by evidence that employees with the same performance issues were not

9

fired, does not overcome a motion for summary judgment. *See Oliver v. Amazon.com Servs., LLC*, No. 22-CV-149, 2023 WL 5953197, at *8 (E.D. Wis. Sept. 13, 2023) ("while [plaintiff] makes passing reference in her brief to her being terminated due to her sex[,] . . . her brief contains no argument connecting her termination to her alleged sex discrimination"). Moreover, a careful reading of the Utech Report reveals that none of the other employees evaluated by Utech had the same or even a similar position as Ms. Pratt and, as to each, the strengths and concerns set out in the report were significantly different than for Ms. Pratt. Dkt. No. 33-1 at 199–205.

Mr. Jacobs also testified that, in addition to the documented issues described above, he had personally received complaints from numerous employees that they did not trust Ms. Pratt. DPFOF ¶ 60. He testified he "couldn't walk through the foundry without many random workers expressing their concern with the direction of the HR department was going." *Id.* ¶ 61. Mr. Jacobs also considered the complaints about the HR Department from the Finance Department when completing renewals under the Affordable Care Act and noted that the HR Department was seen as a major contributor to the rumor mill. *Id.* ¶¶ 64–65.

Ms. Pratt objects to much of this evidence as hearsay. It is not offered to prove the truth of the matter asserted, however, but to show what information Mr. Jacobs received and acted upon. The official and informal reports Mr. Jacobs received therefore do not constitute hearsay. *See* Fed. R. Evid. 801(c)(2). Nor does Ms. Pratt's disagreement with these assessments create an issue of fact. "[I]t is the perception of the decisionmaker, not the employee, that is relevant." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398–99 (7th Cir. 1998) (citing *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865 (7th Cir. 1996)). In deciding a motion for summary judgment in a discriminatory discharge case under Title VII, the court is not concerned with whether the employer's decision was right or wrong; rather, the court is concerned solely

with whether the reason for which the employer discharged the employee was discriminatory. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

The undisputed facts before the court make clear that WAF articulated reasons for discharging Ms. Pratt that were well supported by the evidence before the company and were not forbidden by law. No evidence has been submitted that even suggests the decision to terminate Ms. Pratt was on account of her sex. Ms. Pratt has failed to present evidence that any similarly situated employee was treated differently. WAF is therefore entitled to summary judgment on her claim for discriminatory discharge.

**B. Title VII Pay Discrimination Claim**

Ms. Pratt's pay discrimination claim also fails. She has failed to identify any similarly situated employees outside the protected class who were treated more favorably than her as to compensation. To establish this element, Pratt must identify "someone who is directly comparable to [her] in all material respects except for membership in the protected class." *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012). "A similarly situated employee need not be 'identical,' but the plaintiff must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].'" *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

For purposes of pay discrimination, Ms. Pratt identifies only Emery Coonen as a comparator. Emery Coonnen was hired as the Environmental Health & Safety (EHS) Manager in May 2017, at an annual salary of $85,328.43. DPFOF ¶ 23. She argues that both of their roles had a comparable scope of responsibilities, that both had a similar amount of experience,

11

education, and qualifications, that Mr. Jacobs was involved in setting both of their salaries, and that Ms. Pratt had more management responsibility because she had direct reports.  The record does not support her contention.

Mr. Coonen's overall job responsibilities included anticipating, assessing, and addressing operational safety, environmental risks, and safety opportunities to improve the conditions of WAF's workforce and the company's footprint in both the community and environment.  *Id.* ¶ 26. Specifically, Mr. Coonen was responsible for developing and administering various environmental, health, and safety plans and procedures for all WAF personnel; planning, organizing, and controlling all activities of the safety department; identifying risks and implementing plans and procedures for mitigating risk; performing Job Safety Analysis and implementing procedures to support employee safety; and measuring and recording environmental data for DNR-EPA Compliance.  *Id.* ¶ 27.  In other words, he held a very different position from the one Ms. Pratt held.

It is true that Ms. Pratt's predecessor, Mr. Behnke, was responsible for environmental health and safety, in addition to his HR responsibilities.  *Id.* ¶ 29.  But in July 2017, Ms. Pratt updated the HR Manager job description to remove the EHS responsibilities because that became Mr. Coonen's job.  *Id.* ¶ 31.  Based on the new job description, Mr. Coonen and Ms. Pratt shared only two responsibilities out of the 15 essential functions of the HR Manager: responding to OSHA if they visited the company and attending meetings related to the company's worker's compensation plan, which only occurred up to five times a year.  *Id.* ¶ 32.

The inference of discrimination may be stronger if the same decisionmaker set their salaries because "[d]ifferent decisionmakers may rely on different factors."  *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826–27 (7th Cir. 2008).  Here, however, the undisputed facts establish that

12

Mr. Jacobs set Ms. Pratt's salary, while the executive team, of which Mr. Jacobs was only a member, set Mr. Coonen's salary. Thus, even if Mr. Jacobs is a member of the executive team, the team as a whole may have relied on different factors than if Mr. Jacobs had set Mr. Coonen's salary by himself.

The undisputed facts show that Mr. Coonen and Ms. Pratt had different job duties and reported to different supervisors. This is fatal to her claim. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (plaintiff "fails in her attempts to show that [alleged comparators] are similarly situated because neither [comparator] held the same position as [plaintiff], nor did they have similar job responsibilities"). As such, Ms. Pratt has failed to show that Mr. Coonen, as EHS Manager, was similarly situated to her. Because Ms. Pratt cannot establish a *prima facie* case in her pay discrimination claim, the court's inquiry ends there, and WAF need not articulate a legitimate, nondiscriminatory reason for failing to pay her more. WAF's motion for summary judgment on Ms. Pratt's pay discrimination claims will therefore be granted.

### C. Retaliation Claim

There are "two methods through which a claimant may prove a *prima facie* retaliation claim: the 'direct' method and the 'indirect' method." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Id.* (citation omitted). The indirect method "allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and

13

(4) he was treated less favorably than similarly situated employees who did not engage in protected activity." *Id.*

Only the direct method is at issue here. Ms. Pratt argues that there is a direct causal link between her alleged protected activities and her termination. She does not point to a similarly situated comparator that was treated more favorably. The court will therefore analyze her claim as a direct method claim. The dispute centers on the first and third elements of the claim.

Ms. Pratt claims that her "investigation into Boyd was responsible for her negative performance review." Dkt. No. 36 at 5. She further contends that her poor 2018 performance review was due to her investigation of Mr. Boyd, and when she "complained that her negative review was given to her in retaliation for her Title VII protected reporting, [she] was fired a week later." *Id.* at 7. Ms. Pratt adds that she reported similar concerns about the way Mr. Boyd and others treated women to Mr. Jacobs. WAF argues in response that Ms. Pratt's report on Mr. Boyd's conduct was not protected, given her position as HR Manager and, in any event, she is unable to establish a causal relation between her alleged protected conduct and her termination.

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). This general prohibition has two distinct clauses that give rise to two distinct claims: a participation clause and an opposition clause. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 747 (7th Cir. 2010). "The participation clause prohibits retaliation against an employee who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." *Hatmaker*, 619 F.3d at 747. "A purely

internal investigation does not involve a 'charge,' or testimony, and neither is it a 'proceeding' or a 'hearing.'" *Id.* Since there was no Title VII charge, Ms. Pratt's claim can arise, if at all, only under the opposition clause.

The opposition clause protects an employee who opposes "any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). In *Crawford*, the Supreme Court held that the term "oppose" "carries its ordinary meaning: [t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand." 555 U.S. at 276 (internal quotations and citations omitted). Quoting an EEOC Guideline, the Court noted, "'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'" *Id.*

Application of this definition poses significant difficulties when the plaintiff in a retaliation case is, like Ms. Pratt, the employer's human relations manager. This is because the job responsibilities of a person who works in the human relations department is to investigate and report discrimination within the company by which she is employed. As one employer described the problem:

> allowing personnel officers to bring retaliation claims under the opposition clause based on complaints lodged in connection with their official duties would create an automatic prima facie case of retaliation for any terminated human resources or EEO employee. Since such employees' daily work involves reporting on claims of discrimination in ways that could be construed as "opposing" discrimination, Defendants reason that any adverse action taken against those employees would likely be in close proximity to such opposition and could consequently risk embroiling an employer in gratuitous litigation.

*Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015).

In response to the defendant's argument and consistent with *Crawford*, the Second Circuit held in *Littlejohn* that "[t]o the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself

15

is not a protected activity under § 704(a)'s opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII." *Id.* More is required. Such an employee has engaged in protected conduct, the court held, if the employee "actively supports other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of her employer." *Id.* (internal quotations and brackets omitted). Moreover, "[the] opposition, to be protected by the statute, must be based on a good-faith (that is, honest) and reasonable belief that it is opposition to a statutory violation." *Hatmaker*, 619 F.3d at 747. A plaintiff claiming retaliation "must not only have a subjective (sincere, good faith) belief that [she] opposed an unlawful practice; [her] belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000). As the court explained in *Mattson v. Caterpillar, Inc.*, "Title VII was not designed to arm employees with a tactical coercive weapon under which employees can make baseless claims simply to advance their own retaliatory motives and strategies." 359 F.3d 885, 890–91 (7th Cir. 2004) (internal quotations omitted).

In this case, Ms. Pratt's investigative report on Mr. Boyd was not protected activity because the conduct she was investigating did not involve prohibited discrimination under Title VII. The EEOC Guidelines define "sexual harassment" to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (citing 29 CFR § 1604.11(a) (1985)). "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Id.* (citing 29 CFR § 1604.11(a) (1985)); *see also Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005) ("Sexual horseplay differs from sex discrimination, and Title VII covers only discriminatory

16

conduct."). Ms. Pratt knew at the time she made her report that Mr. Boyd's remarks to Ms. Goehring were not unwelcome.

Moreover, sexual harassment must be severe and pervasive and must have occurred because of the allegedly harassed person's sex. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016). Here, regardless of the impropriety of Mr. Boyd's joke, it was an isolated instance and there is no evidence that it was intended to harass Ms. Goehring. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (finding the complained-of conduct was not harassment when it was "a single instance of sexually-charged remarks which, however imprudent they may have been, were relatively tame"). Even the person that first reported the incident that Ms. Pratt wrote up denied that sexual innuendos between Mr. Boyd and Ms. Goehring were "constant" and acknowledged that they went both ways. Dkt. No. 33-1 at 176.

Alternatively, WAF argues that Ms. Pratt cannot establish causation. "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Therefore, to survive summary judgment, Ms. Pratt must present evidence from which a reasonable jury could find that WAF terminated her *because of* her complaints regarding discrimination. *Id.* Ms. Pratt contends that WAF terminated her because she complained about not receiving a bonus in retaliation for protected activity. However, there is no evidence that Mr. Boyd was involved in the decision to terminate Ms. Pratt's employment, or that Mr. Jacobs took issue with Pratt's investigation into Mr. Boyd. Further, the March 7, 2019 email in which Ms. Pratt complained about not receiving a bonus was not itself protected activity because, as explained above, the underlying complained-of activity did not constitute harassment, nor did she take any step to oppose discrimination with her email. Accordingly, even if being fired only a week after she sent the email is generally indicative of

17

causation, Ms. Pratt cannot provide a causal link between her firing and any protected activity. Instead, more than a year passed from the time that Ms. Pratt conducted her statutorily protected investigation into Mr. Boyd's conduct and her termination. When "substantial time lapse[s] between the protected activity and the adverse employment action [there] is counter-evidence of any causal connection." *Filipovic v. K & R Express. Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999). Thus, Ms. Pratt cannot establish causation and WAF's motion for summary judgment on Ms. Pratt's retaliation claim will be granted.

## CONCLUSION

For these reasons, WAF's motion for summary judgment (Dkt. No. 30) is **GRANTED** and the case is **DISMISSED**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 22nd day of April, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge